# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ESTATE OF TOREY ADRELL BREEDLOVE,**

                  **Plaintiff,**

**v.**                                        **Case No:  6:11-cv-2027-Orl-31TBS**

**JOHN LEONE, JASON POPOVICH, TROY TIEGS, RANDALL DEAN ROOT, RICHARD SCHMELTZER, JASON GORBERG, RAFAEL CRUZ, PAUL VOLKERSON, HECTOR CARTEGENA, TONY RODRIGUEZ, DENNIS ELA, JERRY DEMINGS and MICHAEL DAVIS,**

                  **Defendants.**

---

## ORDER

This cause comes before the Court on three Motions for Summary Judgment. One filed by Defendants John Leone, Jason Popovich, Troy Tiegs, Randall Dean Root, Richard Schmeltzer, Jason Gorberg, Rafael Cruz, Paul Volkerson, Hector Cartegena, and Tony Rodriguez (Doc. 83); one filed by Defendant Jerry Demings, in his official capacity as Sheriff of Orange County, (Doc. 84); and one filed by Defendants Michael Davis and Dennis Ela (Doc. 92). Plaintiff, Estate of Torey Adrell Breedlove, has filed three responses (Docs. 121, 122, and 123) and Defendants filed three replies (Docs. 124, 125, and 126).

## I.    Background

On January 5, 2010, Torey Adrell Breedlove ("Breedlove") died in a hail of gunfire at the hands of ten deputies of the Orange County Sheriff's Office ("OCSO") who were attempting to

arrest him for vehicle theft. Breedlove's estate, represented by Tiffany Breedlove, initiated this excessive force case on December 21, 2011. The operative Second Amended Complaint asserts two counts for violation of 42 U.S.C. § 1983 against twelve deputies: John Leone, Jason Popovich, Troy Tiegs, Randall Dean Root, Richard Schmeltzer, Jason Gorgberg, Rafael Cruz, Paul Volkerson, Hector Cartegena, Tony Rodriguez, Michael Davis, and Dennis Ela (collectively, the "Deputies" or "Officers") (Count I); and against Sheriff Jerry Demings in his official capacity as the Sheriff of Orange County (Count II). Defendants move for summary judgment on all counts. In this context, all record evidence must be viewed in a light most favorable to the Plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 245 (1986). The relevant facts, viewed in that light, are as follows.

On January 4, 2010, Defendant Schmeltzer noticed a stolen Dodge Ram (the "Ram") in the parking lot of a west Orlando apartment complex parked near a GMC Denali (the "Denali") he knew belonged to Breedlove. Breedlove had been a suspect in a prior auto theft investigation in November 2009. That investigation ended in a vehicle pursuit where two occupants fled on foot.[1] One occupant, Demetric Carter ("Carter"), was apprehended, but the second escaped—Carter later identified Breedlove as the other suspect. A firearm was recovered, but the parties dispute whether Carter attributed the firearm to Breedlove. Defendants attach great weight to this information because, they claim, it establishes that Breedlove was a flight risk and known to be "frequently armed."

Suspecting that Breedlove had stolen the Ram, Deputies placed a GPS device on the vehicle and followed it when it "went mobile" in the early morning hours of January 5, 2010— driven by Breedlove. While Breedlove was away, the Deputies formulated a plan to arrest him

---

[1] The specific details of this event are unclear.

when he returned. The plan was to deflate the tires on the Denali and then for Defendants Gorberg and Schmeltzer to use their unmarked OCSO vehicles to block in the Ram and the Denali. Defendants Cruz and Leone were to "take down" Breedlove "preferably after [he] exited the stolen truck and was on foot." (Doc. 83 at 5). Several other deputies were positioned around the complex to contain Breedlove should he attempt to flee.

At 5:00 am on January 5, 2010, Breedlove returned to the apartment complex in the stolen Ram and parked in a spot near his Denali.[2] He exited the vehicle and, according to Leone, "may have made two trips back and forth between the [Ram] and [Denali] unloading items." (Doc. 114-1, 53:17-18). Deputies, however, did not attempt to apprehend Breedlove until he entered the Denali and started the engine. [3]

Shortly after Breedlove entered the Denali, two or three officers approached with weapons drawn.[4] Breedlove quickly reversed out of the parking spot and struck an unoccupied vehicle parked in a space behind the Denali.[5] He then accelerated forward in an attempt to exit the parking lot before colliding with an SUV driven by Deputy Schmeltzer. Schmeltzer was attempting to trap the Denali in the parking spot, but arrived slightly late. As a result, Schmeltzer hit the Denali on

---

[2] *See* Exhibit 1. Attached to this Order are six diagrams which help illustrate the events in question. They were taken from Doc. 91-1, a "Preliminary Engineering Report" filed by one of Defendants' experts, Christopher M. Stewart. They are used herein for illustrative purposes only.

[3] In addition to the accounts of the officers on scene, Plaintiff cites to the depositions of two people who lived in the apartment complex and witnessed at least a portion of the events. Demetres Baker saw the scene unfold from a stairwell, while Phyllis Kennison, watched from a window overlooking the parking lot. Baker's deposition can be found at Doc. 120-1 while Kennison's is at Doc. 116-1. The following account is based largely on their depositions since they are generally more favorable to the Plaintiff.

[4] Officers shouted something at Breedlove during this encounter. Deputy Gorberg recalls that he said only "Get your hands up, show me your hands," (Doc. 115-1, 25:22-23), while Leone states that he shouted "Police, hands up; police, hands up." (Doc. 114-1, 56:4-5).

[5] *See* Exhibit 2

the passenger's side door as Breedlove attempted to maneuver around him.[6] The Denali accelerated around a corner, sideswiping several parked cars, when it was hit head-on by Defendant Ela's unmarked Ford F-150 (the "F-150").[7] Another unmarked OCSO vehicle, driven by Volkerson, came around the back of the F-150 to "back it up" for fear that the Denali could push past the lighter F-150. At this point, Ela's F-150 and Breedlove's Denali were nose-to-nose in a corner of the parking lot. According to Phyllis Kennison, who saw the events from her apartment window, Breedlove was "trapped like a rat" between the F-150 and the back corner of the parking lot.[8]

Once the Denali was pinned, Officers assumed tactical positions around the front of the car and drew their weapons. Plaintiff relies on one witness who claims that Breedlove immediately raised his hands in surrender, but the Officers opened fire without warning, unloading the first of two volleys into the driver's seat of the Denali. (Doc. 120-1). Defendants claim that shots were fired upon hearing a revving sound from the Denali pushing against the F-150 and seeing Breedlove turn the front wheels to the side, in the direction of several officers. Crediting Plaintiff's account,[9] however, it was Ela's F-150 that emitted the revving noise as it forced Breedlove's Denali into the back of a parked car. The Denali had a flat front tire and was bumper-to-bumper against the F-150, leaving no room to maneuver.

Breedlove may have been struck in this initial fusillade, but it is undisputed that after the first round of gunfire he raised his hands and said something to the effect of "they're up," in an

---

[6] *See* Exhibit 3. Deputy Volkerson stated in deposition that he heard several shots immediately after this collision. (Doc. 102-1, 39:4-10). There is no evidence, however, that Breedlove or the Denali were struck by gunfire at this point. Plaintiff does not specifically address these alleged shots.
[7] *See* Exhibits 4 and 5
[8] (Doc. 123-7, 3:23). *See* Exhibit 6.
[9] Based largely on Demetres Baker's testimony. (Doc. 120-1).

attempt to surrender. As the Deputies approached however, they claim Breedlove dropped his hands and again attempted to maneuver around the F-150 by revving the engine and turning the front wheels. It was then that the Deputies fired the second volley. Plaintiff disputes this, relying instead on a witness who claims that the Officers paused only to reload their weapons—Breedlove had his hands up the entire time. (Doc. 120-1).

In all, 137 shots were fired into the Denali, killing Breedlove, who was unarmed. Each Officer fired upon Breedlove, except for Defendants Ela and Davis, who were supervisors on the scene.

Significantly, according to Plaintiff, at no point in the course of these events did the Officers attempt to identify themselves. All the vehicles were unmarked with their headlights and emergency lights turned off. Officers were dressed in either plain clothes or unmarked camouflage with no visible indication that they were members of the OCSO. Moreover, at least one witness suggests that although Officers shouted commands at Breedlove, they never verbally indicated that they were police. (Doc. 120-1).

## II.   Standards

### A.  Summary Judgement

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347,

1351-52 (M.D. Fla. 2003). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

### B.  Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from individual liability as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).  Qualified immunity is an immunity from suit rather than a mere defense to liability, and it is effectively lost if a case is erroneously permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d

411 (1985).  Unless the plaintiff's allegations state a claim of violation of a clearly established constitutional right, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.  *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).  Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in question in fact committed those acts.  *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815.

To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority.  *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003).  Once the defendants establish this, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate.  *Id.*  The Supreme Court has established a two-part test to determine whether qualified immunity should apply.  The court must determine whether plaintiff's allegations, if true, establish a constitutional violation."  *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002).  This requires the court to determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.  *Gonzalez*, 325 F.3d at 1234.  The second prong of the test requires the court to determine whether the right was "clearly established."  *Id.*  Although it will often be appropriate to consider whether a constitutional violation has been alleged before assessing whether the right at issue is clearly established, the two determinations may be made in either order.  *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

## C. Excessive Force

The Fourth Amendment provides the right to be "free from the use of excessive force in the course of an investigatory stop or other 'seizure' of the person."  *Kesinger ex rel. Estate of*

*Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004); *see also* U.S. Const. amend. IV. To establish an excessive force claim, a plaintiff must first show that she was "seized" within the meaning of the Fourth Amendment. *See Vaughan v. Cox*, 343 F.3d 1323, 1328 (11th Cir. 2003). A Fourth Amendment seizure occurs when "there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (emphasis in original).

If that showing is made, the plaintiff must then establish that the force used to effectuate the seizure was unreasonable. *See Brower*, 489 U.S. at 599, 109 S.Ct. at 1382-83. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger*, 381 F.3d at 1248 (citing *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)). "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (internal quotation marks and citations omitted). The inquiry should be viewed from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Connor*, 490 U.S. at 396-97, 109 S.Ct. at 1872.

The Eleventh Circuit has distilled from *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), three key factors concerning the reasonableness of the use of deadly force.

*See Vaughan v. Cox,* 343 F.3d 1323, 1329–30 (11th Cir. 2003). Thus, an officer may use deadly force to stop a fleeing felony suspect when the officer:

(1)     "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm;"

(2)     reasonably believes that the use of deadly force was necessary to prevent escape; and

(3)     has given some warning about the possible use of deadly force, if feasible.

*Id.* at 1329–30 (emphasis removed) (quoting *Garner,* 471 U.S. at 11–12, 105 S.Ct. 1694). Although this list of factors may be relevant in assessing the reasonableness of using deadly force, "in the end we must still slosh our way through the factbound morass of 'reasonableness.' " *Scott v. Harris,* 550 U.S. 372, 383, 127 S.Ct. 1769, 1778, 167 L.Ed.2d 686 (2007). What constitutes an "unreasonable" use of deadly force is necessarily fact specific. *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009); *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012).

**III.    Discussion**

**A. Excessive Force**

In 1985, the Supreme Court set out the standard for an officer's use of deadly force against a fleeing suspect. In *Tennessee v. Garner*, officers were dispatched to the scene of a burglary. 471 U.S. at 3-4. When they arrived, one officer spotted Garner running across the back yard of a house. The officer shouted "police, halt," but Garner began to climb over the fence. Although he was "reasonably sure" that Garner was unarmed, the officer was convinced that Garner would elude capture if he made it over the fence, so he fired. "The bullet hit Garner in the back of the head. . . . Ten dollars and a purse taken from the house were found on his body." *Id*. at 3-4. On

these facts, the Court found that deadly force was not justified. It also took the opportunity to set

out a new standard,

> [w]here the officer has probable cause to believe that the suspect poses a threat of
> serious physical harm, either to the officer or to others, it is not constitutionally
> unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens
> the officer with a weapon or there is probable cause to believe that he has
> committed a crime involving the infliction or threatened infliction of serious
> physical harm, deadly force may be used if necessary to prevent escape, and if,
> where feasible, some warning has been given.

*Id.* at 11-12. For years courts applied this standard with no great difficulty. *See* e.g., *Vaughan v.

Cox*, 343 F.3d 1323 (11th Cir. 2003); *Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002);

*O'Neal v. DeKalb County, Ga.*, 850 F.2d 653, 658 (11th Cir. 1988).

In 2007, however, the Court lowered the bar considerably for cases involving a vehicle

pursuit. In *Scott v. Harris*, police attempted to stop a suspect ("Harris") who was travelling at 73

miles per hour in a 55-mile-per-hour zone. 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

Instead of pulling over, Harris sped away, leading police on a chase for nearly ten miles down a

two lane road at 85 miles per hour. In the midst of the chase, Harris pulled into a parking lot and

was nearly boxed in by police vehicles. He was able to evade the trap by making a sharp turn and

colliding with a police car. Six minutes after the chase had begun, police attempted to end the

pursuit by employing a "PIT" maneuver. One officer pushed his bumper into the back of Harris's

vehicle, causing it to lose control, overturn and crash—badly injuring Harris and rendering him a

quadriplegic. *Id*. at 375.

On these facts, a strict application of *Garner* might have resulted in a denial of qualified

immunity to the officer. *See id*. at 394 (Stevens, J. dissenting). Indeed, the Eleventh Circuit denied

qualified immunity because it found that Harris posed "little, if any, actual threat to pedestrians or

other motorists, as the roads were mostly empty and Harris remained in control of his vehicle, and

there is no question that there were alternatives for a later arrest." *Harris v. Coweta County, Ga.*, 433 F.3d 807, 815 (11th Cir. 2005), *rev'd sub nom., Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

After reciting the *Garner* standard, however, the Supreme Court distinguished it, noting "[a] police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person." *Id*. at 383. "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' *Garner* was simply an application of the Fourth Amendment's 'reasonableness test, . . . to the use of a particular type of force in a particular situation." *Id*. at 382 (citations omitted). After viewing the videotape of the chase, the Court concluded that "[t]he car chase that respondent initiated in this case posed a substantial and immediate risk of serious physical injury to others; no reasonable jury could conclude otherwise." *Id*. at 386.

*Harris* received some criticism from courts and scholars in the years after its publication both for its reasoning and for apparently expanding the scope of the reasonable use of deadly force. *See, e.g., Beshers v. Harrison*, 495 F.3d 1260, 1272 (11th Cir. 2007) (Presnell, J. concurring); Karen M. Blum, *Scott v. Harris: Death Knell for Deadly Force Policies and Garner Jury Instructions?* 58 Syracuse L. Rev. 45, 66 (2007); Dan M. Kahan, et. al., *Whose Eyes Are You Going to Believe? Scott v. Harris and the Perils of Cognitive Illiberalism*, 122 Harv. L. Rev. 837, 839 (2009). Applying *Harris* however, most courts, including the Eleventh Circuit, have recognized that the bar had been significantly lowered (from an officer's viewpoint) for cases involving a vehicle.

In *Long v. Slaton*, for example, the Eleventh Circuit held that an officer acted reasonably in shooting a psychotic individual, not suspected of any crime, who seized control of the officer's

police cruiser. 508 F.3d 576, 579 (11th Cir. 2007). "Although at the point of the shooting Long had not yet used the police cruiser as a deadly weapon, Long's unstable frame of mind, energetic evasion of the deputy's physical control, Long's criminal act of stealing a police cruiser, and Long's starting to drive—even after being warned of deadly force—to a public road gave the deputy reason to believe that Long was dangerous." *Id.* at 581-82. The court stressed that its decision was based on the unique predicament caused by a "mentally unstable" individual who had cloaked himself "with the apparent authority of a law enforcement officer," and who "had been warned that deadly force would be used if he did not leave the cruiser." *Id.* at 581, 583–84.

Recently, in *Terrell v. Smith*, a decedent ("Zylstra") suspected of drug possession and driving without headlights jumped into his vehicle and began to drive away when an officer positioned himself in the open driver's-side door of the car. 668 F.3d 1244, 1248 (11th Cir. 2012). The court stated the relevant facts as follows:

> Zylstra acted as if he were going to kneel down, but instead he turned and jumped back into the vehicle. Officer Smith ran after Zylstra and managed to place himself in the open doorway of Zylstra's car, an area that the parties call "the V," as Zylstra attempted to make a U-turn in Smith's direction. Smith continued to run in the V alongside the vehicle as it moved forward, repeatedly warning Zylstra to stop the car. The vehicle's door and frame struck Smith's body as Zylstra attempted to turn the vehicle. [A witness recalled that] "the under part of the open part of the door was hitting [Smith], kind of pushing him back." After multiple warnings, Smith fired two shots, killing Zylstra.

*Id.* at 1249. The court held that the use of force was reasonable because, "[e]ven if in hindsight the facts show that [the officer] perhaps could have escaped unharmed, an objectively reasonable law enforcement officer could well have perceived that the moving vehicle was being used as a deadly weapon, especially after the driver had been repeatedly ordered to stop." *Id.* at 1255 (citation omitted).

At least one case establishes that deadly force is not always justified when used against a suspect driving a vehicle. In *Morton v. Kirkwood*, a plaintiff not suspected of any crime was shot by a pursuing officer even though his hands were up and his car was stationary. 707 F.3d 1276 (11th Cir. 2013). Although he drifted slowly away from the officer initially, Morton claimed that he immediately raised his hands and shifted his car into park when the officer shouted, but the officer fired without warning. Under these facts, the court held that the officer's use of deadly force was unreasonable because Morton was not suspected of any crime, did not use or threaten to use his car as a weapon, and was attempting to surrender when he was shot. *Id*. at 1282.

This case is most analogous to *Morton*. Crediting Demetres Baker's testimony, once boxed-in by the F-150, Breedlove immediately threw his hands up in an attempt to surrender. Baker claims that after the Denali was trapped, officers jumped out of their cars, "Aimed. And in a split second they said, What you gonna do, Boy? He [Breedlove] was like this (demonstrating) . . . His hands were up." (120-1, 57:5-22). In response to counsel's question, "the entire time you were watching Mr. Breedlove, could you see his hands were up this entire time?" Baker answered, "Yes, ma'am." (120-1, 57:5-22).[10] Even if Breedlove presented some danger to Officers as he maneuvered through the parking lot, "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999).

Moreover, in both *Terrell* and *Long* deadly force was used contemporaneously with the threat posed by the suspect. Based on Baker's testimony, however, Breedlove posed no risk of immediate harm to Officers when he was shot because his Denali was being forced backwards by the F-150. She said, "I know they was [sic] going backwards. . . . [Breedlove] was being pushed back . . ." (Doc. 120-1, 51:17-18). Phyllis Kennison, who viewed the events from her apartment

---

[10] Though the exact moment Baker came upon the scene is unclear, she claims to have witnessed both volleys of gunfire.

window, recalled that Breedlove was "trapped like a rat. There's no doubt about that." (Doc. 123-7 at 3) *See also*, Doc. 116-1, 19:1-3.

Additionally, Plaintiff's accident reconstruction expert claims that Breedlove did not push back against the F-150. Specifically, the right front Denali tire had been flattened by officers. If the Denali had pushed forward against the F-150 and the Dodge Durango, the expert contends, "the Denali wheels would have necessarily left marks on the pavement, especially the deflated tire which had no rigidity." (Doc. 123-17). Scene photographs in evidence show that no such tire marks were left on the pavement. *Id.*

Defendants cite no case, and the Court is aware of none, where qualified immunity was granted to officers who fired without warning at a trapped, unarmed suspect attempting to surrender.

Though that evidence alone is sufficient to raise a genuine issue of material fact as to whether the use of force in this case was unreasonable, viewing the remainder of the events in a light most favorable to the Plaintiff also suggests that the Officers acted unreasonably. For example, when Deputies encountered Breedlove in the early morning hours of January 5, 2010, he had been a suspect in a single prior auto theft case. While a serious crime, auto-theft does not necessarily "involve the infliction or threatened infliction of serious physical harm," *Garner*, 471 U.S. at 11, and Breedlove was only a suspect—he was never charged, let alone convicted. He had no known history of violence and, according to Plaintiff, was not known to be "frequently armed," as Defendants contend.

Defendants also argue that Breedlove was attempting to flee the scene before he was shot, but in this context "fleeing" connotes a flight from lawful authority. Construed in Plaintiff's favor, the evidence suggests that Breedlove was fleeing from unidentified armed men attempting to ram

his car in unmarked SUVs. A jury could find that Breedlove's brief attempt to flee was a reasonable response to the situation. *See, e.g.,* Jeffrey A. Crapko, *An Argument for Requiring Officer Identification*, 77 U. Chi. L. Rev. 1771, 1783 (2010). A number of courts have recognized the problem that arises when law enforcement officers take official actions without identifying themselves.[11] Indeed, *Wilson v. Arkansas*, 514 U.S. 927, 115 S. Ct. 1914, 131 L. Ed. 2d 976 (1995), which established the knock and announce requirement in connection with the search of a dwelling, rests on the assumption that citizens will ordinarily comply with law enforcement officers. In this case, other than a single prior incident where he was suspected of fleeing from police on foot, the Officers had no reason to think Breedlove would fail to comply with officers who properly identified themselves.[12]

Further, Breedlove did not use, or threaten to use, his car as a deadly weapon as he tried to escape. Officers were attempting to execute a "tactical block" in unmarked cars when they collided with the Denali. Physical evidence suggests that Schmeltzer rammed into Breedlove, not the other way around—the Denali was struck in the passenger door by the front bumper of Schmeltzer's SUV. (*See* Exhibit 2). A reasonable jury could also conclude that the Denali was either in reverse or stationary when hit by Ela's F-150. (*See* Doc. 91-1 at 6, ¶ 11). At no point did Officers have to move to avoid Breedlove's car. No bystanders were at risk. And the entirety of events occurred in a small parking lot at speeds likely no higher than ten miles per hour.

---

[11] *St. Hilaire,* 71 F.3d 20 (1st Cir.1995); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553 (1st Cir.1989); *Carter v. Rogers,* 805 F.2d 1153 (4th Cir.1986); *Johnson v. Grob*, 928 F. Supp. 889, 905 (W.D. Mo. 1996); *Beran v. U.S.,* 759 F.Supp. 886 (D.D.C.1991); *Agresta v. Gillespie,* 158 Pa.Cmwlth. 230, 631 A.2d 772 (1993); *Stack v. State,* 534 N.E.2d 253 (Ind.Ct.App. 1989); *Kyle v. City of New Orleans,* 342 So.2d 1257 (La.Ct.App.1977); *Sparks,* 64 Cal. App. 3d 592, 134 Cal. Rptr. 684 (1976); *Celmer v. Quarberg,* 56 Wis. 2d 581, 203 N.W. 2d 45 (1973); *Grudt v. City of Los Angeles,* 2 Cal. 3d 575, 86 Cal. Rptr. 465, 468 P.2d 825 (1970); *Poole v. City of Louisville,* 107 Ga. App. 305, 130 S. E. 2d 157 (1963).

[12] Defendants dispute this, arguing that Breedlove was known to be "frequently armed" and might have posed a danger to Officers. (*See* Doc. 83 at 4).

A reasonable juror might also question why 137 shots were required to secure an unarmed suspect who drove a few dozen yards through a small parking lot, with a flat tire, at a relatively slow speed causing some minor fender-benders with unoccupied cars, and was pinned between two cars with his hands up. The danger posed by errant rounds likely exceeded the danger posed by the Denali. Additionally, a jury may wonder why Officers waited until Breedlove entered his Denali and started the engine before they attempted an arrest when they had been following him for hours and were prepared for his return to the apartment complex. There was no reason to suspect that he was a danger to police on foot. Even if he was a flight risk, there were over a dozen officers on scene including at least one K-9 unit prepared to chase him if he ran away. A reasonable jury could conclude that Officers used excessive force under these circumstances.

### *Clearly Established*

The second step in determining whether qualified immunity applies is whether the law was "clearly established." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 823 (11th Cir. 1997) (quoting *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)). This determination is a difficult one, and is based on an objective determination of what the officer knew at the time of the alleged violation. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Plaintiffs may point to either "(1) earlier case law from the Supreme Court, [the Eleventh Circuit], or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or

statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of Defendants' conduct." *Long v. Slaton,* 508 F.3d 576, 584 (11th Cir. 2007) (citing *Marsh v. Butler Cnty.,* 268 F.3d 1014, 1031–33 (11th Cir. 2001) (en banc)).

Breedlove's Fourth Amendment right to be free from the use of deadly force was clearly established well before January 5, 2010, the morning he was shot. *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Eleventh Circuit has applied *Garner* to car chases and have "consistently upheld an officer's use of force and granted qualified immunity" where the plaintiff "used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough,* 559 F.3d at 1207. But where the plaintiff did not use or threaten to use his car as a weapon, the use of deadly force has been rejected. *Vaughan v. Cox,* 343 F.3d 1323 (11th Cir. 2003).

In this case, construing the evidence in his favor, Breedlove did not use his car as a deadly weapon, nor did he present an immediate threat to anyone on scene, and the Officers did not attempt to warn him prior to using deadly force. Both collisions in this case were initiated by Officers, not Breedlove. Moreover, even if he was a threat initially, Breedlove was immobilized and attempting to surrender when he was shot. *Caruthers v. McCawley*, 339 F. App'x 987, 989 (11th Cir. 2009) (affirming denial of qualified immunity for officers who shot a suspect who had his hands up in a "surrender position"). It was clearly established at the time Breedlove was shot that officers could not use deadly force on a suspect who was both attempting to surrender and posed no imminent threat of serious physical harm. *Id. See also*, *Garner,* 471 U.S. 1; *Cox*, 343 F.3d 1323. Accordingly, qualified immunity will be denied to Defendants John Leone, Jason

Popovich, Troy Tiegs, Randall Dean Root, Richard Schmeltzer, Jason Gorberg, Rafael Cruz, Paul Volkerson, Hector Cartegena, and Tony Rodriguez.

### B.  Sheriff Demings in his Official Capacity

In *Monell v. Dept. of Soc. Servs. of New York*, the Supreme Court rejected the proposition that municipalities can be held liable under the doctrine of *respondeat superior*. 436 U.S. 658, 694 (1978). Instead, a Plaintiff is required to show that the Constitutional injury alleged was the result of a custom or policy. *Id.* Where no stated policy exists, a Plaintiff must show that there was a pattern of deliberate indifference that is "so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997); *see also Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310-11 (11th Cir. 2011).

Municipal liability may be based on a claim of inadequate training where "a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants such that the failure to train can be properly thought of as a city policy or custom that is actionable under § 1983." *Albra v. City of Ft. Lauderdale*, 232 Fed. App'x 885, 890 (11th Cir. 2007) (citations omitted). Establishing municipal liability for a failure to train offending employees presents "difficult problems of proof," lest the inquiry collapse into *respondeat superior*. *Connick v. Thompson*, 131 S.Ct. 1350, 1365, 179 L.Ed.2d 417 (2011). Furthermore, vague and conclusory allegations without specific factual support are insufficient to support a civil rights complaint. *Albra*, 232 Fed. App'x at 890 (citing *GJR Invs., Inc. v. County of Escambia, Florida*, 132 F.3d 1359, 1367 (11th Cir. 1998) and *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003)).

Plaintiff argues that (1) OCSO has a practice of not warning suspects prior to the use of deadly force even where feasible; (2) OCSO fails to train officers on the "objective reasonableness

standard"; and (3) OCSO's failure to adopt the International Association of Chiefs of Police ("IACP") Model Policy is evidence of deliberate indifference. Each argument is without merit.

"[D]eadly force may be used if necessary to prevent escape, and if, *where feasible*, some warning has been given." *Garner*, 471 U.S. at 11-12 (emphasis added). Plaintiff argues that there is an unofficial policy of not providing a warning prior to using deadly force. To support this contention, however, Plaintiff relies on several vague statements taken out of context. Captain Tom Cockriel testified in deposition that he does not "deal" with *Tennessee v. Garner*, (Doc. 103-1, 98:1-2), and further, "when things start to go down, the time for specific dialogues other than telling people what you would like them to do are – are well past that point. You're making them aware of who you are and telling them what you would like them to do, and at that point that's really the only thing that we need to be conveying to them." (Doc. 103-1, 82:8-83:20). Cockriel later clarifies that, while they do not train based specifically on court cases, "they influence everything we do as far as building our policies and building our training." (Doc. 103-1, 98:5-12). Similarly, Plaintiff cites to a statement made by Lieutenant Joseph Scutero in deposition that, "there's no requirement to issue a warning, no," (Doc. 99-1, 97:13), but fails to include a later response in which Scutero indicates that, while there is no written policy that warnings should always be given, "[o]ur use of force policy talks about verbal, what we call verbal direction" (Doc. 99-1, 97:17-19), and that "[t]here are times when issuing a verbal warning may be appropriate and applicable and able, and there are times when there's no time for a verbal warning." (Doc. 99-1, 98:10-16). Even assuming, as the Court must, that Officers failed to provide a warning in this case, these statements are insufficient to suggest that OCSO had a policy of failing to warn even where feasible.

Plaintiff's second argument fails because, while a court reviews the conduct of officers based on the "objective reasonableness standard," there is no requirement that officers be trained based on that standard. Plaintiff points to no other evidence to suggest that Officers were improperly trained on the use of deadly force.

Finally, Plaintiff points to OCSO's failure to adopt the IACP Model Policy as evidence of deliberate indifference. The IACP Model Policy with regard to the use of deadly force, states—according to Plaintiff—"Firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle. The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force." (*See* Doc. 122 at 18).[13] The IACP Model Policy is at odds with the current state of the law. *See Harris*, 550 U.S. 372. As such, failing to adopt it cannot be seen as "deliberate indifference." Evidence suggests that OCSO provides sufficient training to its officers on the use of deadly force. Summary judgment will therefore be granted in favor of Sheriff Demings.

### C. Defendant Davis

Defendants Davis was the head of the auto-theft division when Breedlove was killed on January 5, 2010. He did not witness the relevant events, but was on scene at the entrance to the parking lot when Breedlove was killed. Plaintiff argues that Davis should be liable for failing to train Officers on "tactical park" situations and on the proper use of deadly force.

Supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. *Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir. 1994) (citation and quotation omitted).

---

[13] The IACP Model Policy does not appear to be part of the record.

Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.

*Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted). In addition, the causal connection may be established and supervisory liability imposed where the supervisor's improper "custom or policy ... result[s] in deliberate indifference to constitutional rights." *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir. 1991) (citing *Zatler v. Wainwright,* 802 F.2d 397 (11th Cir. 1986)). *See also Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999).

Plaintiff claims that (1) Officers are not required to attend regular firearm or "tactical park" training, (2) the position of "auto theft detective" is largely an "office job," (3) Officers are not trained in the proper use of deadly force, and (4) "amid this atmosphere of minimal training, Sergeant Davis set into motion a barebones plan which abdicated command responsibility to his detectives." (Doc. 121 at 10).[14] Each claim, however, is unsupported in the record. All OCSO deputies are required to attend a training program including training on the use of deadly force. (See Doc. 124 at 3). Auto theft detectives attend semi-regular training on tactical parking operations and, although not required, deputies are encouraged to practice at the shooting range. (Doc. 121 at 10). There is no evidence that Davis's plan was so inadequate as to constitute deliberate indifference.[15] Accordingly, summary judgment will be granted in favor of Defendant Michael Davis.

---

[14] Plaintiff also argues that Davis failed to inform Officers that the Denali had a flat tire. While this knowledge might have impacted Officer's perception of events, that alone is insufficient to constitute deliberate indifference.

[15] Plaintiff cites no authority for the proposition that a supervising officer must establish a

### D. Defendant Ela

Plaintiff's claim against Sergeant Ela is based solely on his alleged "failure to intervene." " '[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.' " *Skrtich v. Thornton,* 280 F.3d 1295, 1302 (11th Cir. 2002) (quoting *Fundiller v. Cooper City,* 777 F.2d 1436, 1441-42 (11th Cir. 1985)); *Priester v. City of Riviera Beach, Fla.,* 208 F.3d 919, 924 (11th Cir. 2000); *Velazquez v. City of Hialeah,* 484 F.3d 1340, 1341-42 (11th Cir. 2007).

Sergeant Ela drove the F-150 that collided with Breedlove and ultimately pinned him in the back corner of the parking lot. Plaintiff argues that Ela was in the best position to appreciate the threat Breedlove posed because he presumably knew that the Denali was not pushing back against the F-150. Thus, Plaintiff claims that Ela should have known that deadly force was not justified and should have instructed Deputies not to fire. *See e.g., Dukes v. Miami-Dade County*, 232 F. App'x 907, 909 (11th Cir. 2007) (A plaintiff, "bleeding from [a] gunshot wound to his chest, stepped out of the vehicle and was slammed to the ground by a police officer. Allegedly, several officers, including Defendants Dean, Goldberg, Guerra, and Llambes, stomped and kicked Dukes." On these facts, the court denied qualified immunity to officers who failed to stop the beating.). In this case, viewing the record evidence in a light most favorable to Plaintiff, Officers fired two volleys of gunfire, lasting 10 to 20 seconds each and pausing for at least 20 seconds in between to reload. Ela was positioned closest to Breedlove, within vocal range of each Officer. He was in the best position to see (1) that Breedlove had his hands up, and (2) that the Denali was not pushing back against the F-150. Moreover, Ela exited his vehicle in between the two volleys of gunfire to survey the situation. A reasonable jury could find that Ela had an opportunity to

---

detailed plan for operations such as this. Other than claiming the plan was "inadequate," Plaintiff provides no evidence of deliberate indifference.

intervene and command Officers to cease fire. Accordingly, Defendant Ela's Motion for Summary Judgment will be denied.

## IV.      Conclusion

Police officers have a difficult job and often have to make split-second decisions to defend themselves or protect others from harm. Qualified immunity grants the police a large degree of protection from suit when acting within their discretionary authority, but this discretion is not unbounded. Viewing the evidence in the light most favorable to the Plaintiff, the conduct at issue here is more akin to an execution than an attempt to arrest an unarmed suspect. The qualified immunity bar is not set that low.

It is therefore **ORDERED** as follows:

1.   The Motion for Summary Judgment (Doc. 83) filed by John Leone, Jason Popovich, Troy Tiegs, Randall Dean Root, Richard Schmeltzer, Jason Gorberg, Rafael Cruz, Paul Volkerson, Hector Cartegena, and Tony Rodriguez is **DENIED**.

2.   Defendant Jerry Deming's Motion for Summary Judgment (Doc. 84) is **GRANTED**;

3.   The Motion for Summary Judgment (Doc. 92) is **GRANTED** with respect to Defendant Michael Davis but **DENIED** with respect to Defendant Dennis Ela;

**DONE** and **ORDERED** in Orlando, Florida on April 19, 2013.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties